UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

PFIP, LLC and
Pla-Fit Franchise, LLC

    v.                            Civil No. 08-271-JL
                                        Opinion No. 2009 DNH 059
You-Fit, Inc.,
You-Fit One, Inc. and
Rick Berks

**O R D E R**

The plaintiffs, PFIP, LLC and Pla-Fit Franchise, LLC, have

sued Rick Berks and two entities in which he has an ownership

interest, alleging trademark infringement and false designation

of origin in violation of the Lanham Act, 15 U.S.C. §§ 1051 et

seq., copyright infringement under the Copyright Act, 17 U.S.C.

§§ 100 et seq., and state-law claims of breach of contract,

misappropriation of trade secrets, and violations of the Consumer

Protection Act, N.H. Rev. Stat. Ann. ("RSA") § 358-A.  The

defendants have moved to dismiss certain claims in favor of

arbitration and to dismiss the others for want of personal

jurisdiction or, in the alternative, to transfer them to the

District Court for the Middle District of Florida.  This court

has subject-matter jurisdiction under 28 U.S.C. §§ 1331 (federal

question) and 1367 (supplemental jurisdiction).[1]

_____

[1]The plaintiffs also invoke diversity jurisdiction, but
their amended complaint identifies PFIP, LLC and Pla-Fit
Franchise, LLC as simply "Limited Liability Companies duly

In objecting to the defendants' motion, the plaintiffs
relied principally, though not exclusively, on a forum selection
clause in a franchise agreement between Pla-Fit and a corporation
(not named as a defendant here) in which Berks formerly held an
ownership interest.  Because Berks no longer holds this interest,
however, the court held a pre-hearing telephone conference to
request additional briefing on whether the forum selection clause
continues to bind him.[2]  After submitting this briefing, the
plaintiffs announced that they still wanted to present the
testimony of live witnesses, including Berks himself, in support
of their argument for personal jurisdiction.  So the court held
an evidentiary hearing, where the plaintiffs' presentation
focused on a theory of personal jurisdiction they had not raised
in their prior filings:  that Berks subjected himself to
jurisdiction here through a year-long series of telephone
conversations with Chris Rondeau, the plaintiffs' chief

---

organized by the laws of the State of New Hampshire, having a
principal place of business" within the state.  For purposes of
diversity jurisdiction, however, a limited liability company does
not have the citizenship of its place of formation or business,
but of each of its members.  Pramco, LLC ex rel. CFSC Consortium,
LLC v. San Juan Bay Marina, Inc., 435 F.3d 51, 54-55 (1st Cir.
2006).  Because the plaintiffs have not alleged the citizenship
of any of the members of PFIP, LLC or Pla-Fit Franchise, LLC, the
court cannot determine whether they are diverse from the Florida
citizens named as defendants.

[2]As discussed infra, certain provisions of the franchise
agreement bound Berks personally.

operations officer, which allegedly comprised a conscious effort to steal the plaintiffs' trade secrets so Berks could make use of them in operating a competing business in Florida through two new corporations he was planning on forming.  Those corporations are named as defendants here.

Based on the evidence and arguments received at the hearing, and the parties' written submissions, the defendants' motion to dismiss for lack of personal jurisdiction is granted, their request to dismiss certain claims in favor of arbitration is denied, and their request to transfer the case to Florida is denied as moot, for the reasons explained in detail <u>infra</u>.


## I.   <u>Applicable legal standard</u>

As the plaintiffs recognize, they bear the burden of showing personal jurisdiction over the defendants.  <u>See</u>, <u>e.g.</u>, <u>Hannon v. Beard</u>, 524 F.3d 275, 279 (1st Cir.), <u>cert. denied</u>, 126 S. Ct. 726 (2008).  This court has three different standards at its disposal for deciding personal jurisdiction:  the prima facie standard, the preponderance of evidence standard, and an intermediate likelihood standard.  <u>See Boit v. Gar-Tec Prods., Inc.</u>, 967 F.2d 671, 675-77 (1st Cir. 1992).  Under the prima facie standard, which is "[t]he most commonly used method," the court simply "accepts properly supported proffers of evidence by a plaintiff as true" in determining whether jurisdiction exists.  <u>Id.</u> at 675.

Furthermore, the court construes this evidence in the light most favorable to the existence of jurisdiction and considers any facts adduced by the defendant only insofar as they are not contradicted by the plaintiff's proof.  See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998). Importantly, though, even the prima facie standard does not require the court, blindly, "to credit conclusory allegations or draw farfetched inferences" advanced by the plaintiff.  Id. (internal quotation marks omitted).

Under the prima facie approach, "the district court acts not as a factfinder but as a data collector," unable to resort to credibility determinations or other "differential factfinding." Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995).  Here, while the parties have briefed and argued the jurisdictional issue under the prima facie standard, the plaintiffs have nevertheless invited the court to base its jurisdictional ruling, at least in part, on what they cast as Berks's lack of credibility.  Using the prima facie standard, however, assessing a defendant's credibility is neither permissible nor necessary, because the plaintiff's version of events controls in the case of a conflict with the defendant's version, as just discussed.[3]  Here, the plaintiffs' version of

_____

[3]It is unclear whether the plaintiffs truly mean Berks's "credibility" as a witness or his character as a person but, as

4

events includes the affidavits filed with their objection to the motion, the joint statement of stipulated facts submitted at the court's direction, and the testimony they adduced at the hearing.[4]  The following facts are drawn from those sources, as well as, again, the defendants' evidentiary submissions insofar as they do not contradict those of the plaintiffs.

## II.  **Background**

Berks has owned and operated gyms in south Florida for nearly thirty years.  In the early going, he became embroiled in a dispute with PFIP, a New Hampshire-based company that franchised gyms, over the ownership of the trademark "Planet Fitness."[5]  At that point, "Planet Fitness" was the name of three gyms owned and operated by Planet Fitness Enterprises ("PFE"), a Florida corporation of which Berks was the president and majority (though not sole) shareholder.  This dispute was resolved, at

---

discussed _infra_, neither factor helps their case here.

[4]Because the parties were provided a hearing to introduce evidence in support of their positions on the jurisdictional question, the court could apply one of the other standards.  _See_ _Foster-Miller_, 46 F.3d at 146.  Since the court of appeals has generally discouraged using those standards, however--and neither side has asked the court to do so--the court will simply apply the prima facie standard which, in any event, imposes the lightest burden on the plaintiffs.  _See_ _id._ at 145-48.

[5]PFIP now simply acts as the licensor of the trademark and other intellectual property; PFIP's sole member, Pla-Fit, acts as the franchisor.

least temporarily, when PFE and PFIP entered into a 2002
settlement agreement, <u>inter alia</u>, assigning all of PFE's rights
in the "Planet Fitness" mark to PFIP in exchange for $75,000 and
an exclusive license to use the mark in a specified region of
south Florida that encompassed the location of PFE's existing
"Planet Fitness" gyms.

PFIP nevertheless went on to open several franchises in that
region under the name "PF Fitness."  Around the same time, PFIP
and PFE began discussing potential business deals, including
PFIP's purchasing PFE's gyms, Berks's becoming a PFIP franchisee,
or the parties' launching a joint marketing campaign.  During
these discussions, Berks remained in Florida, but directed a
number of communications to PFIP in New Hampshire; for their
part, the plaintiffs sent representatives, including Rondeau, to
tour PFE's clubs in Florida.

After the parties failed to reach a deal, PFIP filed suit in
this court against PFE and Berks, as well as three companies he
had formed to the lease the premises for PFE's three "Planet
Fitness" gyms (collectively, the "PFE defendants"), in this court
on June 30, 2004.  PFIP alleged that, notwithstanding the
agreement, these defendants were infringing on its trademarks and
copyrights and violating its rights under New Hampshire law.
This court dismissed the action for lack of personal jurisdiction
over the defendants.  <u>PFIP, LLC v. Planet Fitness Enters., Inc.</u>,

6

2004 DNH 159.  PFIP then refiled the case in Florida state court,
where the defendants asserted counterclaims arising out of the
operation of several PFIP franchises in south Florida under the
"Planet Fitness" mark.

The parties resolved this litigation by entering into a
settlement and license agreement on March 14, 2006.  In this
agreement, which superseded the 2002 settlement agreement, each
party released all claims against the other "arising out of any
purported act or omission occurring prior."  The PFE defendants
agreed, in essence, to limit the scope of their exclusive license
to use the "Planet Fitness" mark:  they could now do so only in
two south Florida counties, and the existing PFIP franchises
would be allowed to continue operating there, with PFIP paying a
monthly royalty to PFE for each.[6]  The PFE defendants further
agreed to "use reasonable efforts to utilize Trademarks, colors,
signage, and other features" in their gyms operating under the
"Planet Fitness" mark to maintain consistency with the appearance
of other "Planet Fitness" gyms.  To this end, the agreement
granted the PFE defendants access to PFIP's franchise materials,
which they agreed to keep confidential.  The agreement also
provided that, if the PFE defendants opened a gym as a PFIP

---

[6]After five years, the territory shrinks further,
encompassing only the seven-mile radius around each of the
defendants' gyms then operating under the "Planet Fitness" marks.

7

franchisee outside their newly designated territory but inside their formerly designated territory, the initial franchise fee ordinarily due would be waived.

As anticipated by this provision, Seven B-Fit, Inc.--a Florida corporation owned, at the time, half by Berks and half by another individual--entered into a franchise agreement with plaintiff Pla-Fit on June 2, 2006, authorizing Seven B-Fit to operate a "Planet Fitness" franchise at a Miami location.  Berks signed the agreement both as president of Seven B-Fit and in his individual capacity as its "Owner"--a defined term discussed in more detail _infra_.  Berks also personally signed a guarantee of Seven B-Fit's obligations under the franchise agreement, a document containing "Investor Personal Covenants Regarding Confidentiality and Non-Competition," and a "Side Agreement" acknowledging, in essence, that the 2006 settlement and license agreement remained in force notwithstanding the franchise agreement.  All of these documents were executed by Berks (in whichever capacity) in Florida, during a visit there by Rondeau.

Because many of the franchise agreement's particular provisions are important to the court's analysis of the motion before the court, they will be discussed in detail _infra_. Briefly, however, PFIP agreed to provide Seven B-Fit with specified assistance, e.g., training, consulting, and materials, including an "Operations Manual," and to allow Seven B-Fit to use

8

"Planet Fitness" and other specified marks, including a "distinctive building design and color scheme," for the purpose of operating a "Planet Fitness" gym in accordance with a number of specified "Methods of Operation."  Seven B-Fit agreed to pay PFIP a monthly royalty in proportion to its membership dues and to submit to various other conditions.

Around the time the franchise agreement was signed, two Seven B-Fit employees traveled to New Hampshire, where they received training from the plaintiffs on certain operational matters over a two-day visit.[7]  Pla-Fit also sent some of the materials contemplated by the franchise agreement, including the operations manual, followed by a series of correspondence on marketing and related matters, to Seven B-Fit in Florida.  Berks recalled that he received some of this information in the form of e-mail messages, which he largely disregarded because he was not involved in the day-to-day workings of the franchise.  He likewise stated that he has never read the operations manual, though he has looked at it.  Berks, in fact, testified that he left the operations of Seven B-Fit's gym to its co-owner, and has visited the facility only three or four times.

_____

[7]While Pla-Fit's vice president of franchising characterized this training as including "critical information," the plaintiffs proffered nothing more on the subject.  Berks, for his part, testified that both he and the trainees considered the training a "complete waste of time."

Rondeau testified that, after Pla-Fit and Seven B-Fit entered into the franchise agreement, he was attending a meeting of Planet Fitness franchisees in Florida when Berks approached him and expressed interest in the plaintiffs' "add-a-friend" program.  So Rondeau invited Berks to call him in New Hampshire, beginning what Rondeau describes as a series of "quite frequent, sometimes weekly and daily" telephone conversations between the men that lasted nearly one year.  In these calls, according to Rondeau, they would discuss "everything that's operational and consistent with running a Planet Fitness Club," including branding, signage, marketing programs, staffing, equipment selection, and the like.

Executing the "Planet Fitness" concept, Rondeau explained, requires calibrating each of these elements to attract and retain the desired clientele, i.e., casual gym users as opposed to serious bodybuilders.  While Rondeau testified that he considered this information to be confidential, he struggled to articulate why, particularly in light of the fact that much of what he described was readily observable to any visitor to a "Planet Fitness" club, e.g., its overall appearance, the mix and arrangement of equipment, and special features like the "lunk alarm" (which is triggered by an employee whenever an overeager patron grunts, dramatically drops a free weight, or otherwise

behaves in a "lunkish" fashion, thus acting as a deterrent).[8]
Rondeau did explain, echoing the arguments of counsel for the
plaintiffs, that they had, through trial and error over several
years, struck upon the "recipe" for effectively combining these
elements into the "Planet Fitness" concept, and that they
consider this "recipe" a trade secret.

Berks sold his interest in Seven B-Fit to one of its
employees, Roger Julianelli, in approximately January 2008.
PFIP, having been notified of the deal beforehand, did not ask
Berks to sign any documents in connection with the transfer,
including the agreement binding an outgoing owner of the
franchisee to certain covenants, contemplated by Article 14.4.9
of the franchise agreement.

Berks has since started another chain of gyms in south
Florida, "You Fit," acting through another Florida corporation,
You-Fit, Inc.  Berks formed You-Fit in May 2007, eleven months
after signing the franchise agreement and while he still
maintained an ownership interest in Seven B-Fit.  You-Fit now
operates gyms in St. Petersburg and Largo, Florida, and plans to

---

[8]Rondeau also had difficulty explaining what counsel for the
plaintiffs sought to characterize as their "formula" for sizing a
particular club to a particular market.  Under repeated
questioning from the plaintiffs' counsel on this subject, Rondeau
continually referred to aspects of a club's physical plant, like
the heating and cooling system and parking lot, which would not
seem to fit the traditional concept of "trade secrets."

open another gym, in Bradenton, Florida, by this summer.[9]  Berks
is the majority shareholder and president of You Fit, Inc.; his
daughter is the only other shareholder.  Though Berks alone made
all the decisions on how to set up the "You Fit" gyms, his
daughter handles their day-to-day operations.  The gyms have been
marketed only to consumers within their immediate vicinity,
principally through a mass mailing sent to every customer within
a three-mile radius--though the plaintiffs claim that the
materials infringe what they anticipate will be their registered
copyright in similar materials.  No New Hampshire resident is a
member of any of the "You Fit" clubs.

       According to Rondeau, the physical layout of the "You Fit"
gyms closely resembles that of a "Planet Fitness" facility,
including the selection and arrangement of the equipment and the
color scheme.  The plaintiffs claim that this, as well as the
gyms' use of the phrases "You Belong" and "30 Minute Express
Workout," amounts to trademark infringement and false designation
of origin in violation of the Lanham Act and RSA 358-A, as well
as breach of the franchise and license agreements.

       The plaintiffs further allege that, in setting up and
operating the gyms, Berks has made use of the alleged trade
secrets he extracted from Rondeau during their series of

---

[9]Defendant You-Fit One, Inc., holds the lease for the St.
Petersburg facility.

conversations in 2006.  When Rondeau was specifically asked what confidential information he believes Berks has appropriated into the You Fit facilities, however, he said, "It's really hard to tell . . . .  It's a secret recipe, it's coaching and it's know-how and it's consulting on what you do when, where, and how." Rondeau acknowledged, in fact, that he knew of no basis for believing that Berks was misappropriating the plaintiffs' trade secrets other than the success he had recently been achieving, coupled with the difference in "culture" between Berks's newer You Fit clubs and his older clubs.[10]

Berks, for his part, testified that he based his decisions on how to set up and run the You Fit facilities on his own experience in the fitness industry, rather than on anything he learned from the plaintiffs in particular.  Berks acknowledged, however, that You Fit's pricing is similar to PFIP's--including the use of a "Lime Card" pricing program that mirrors PFIP's "Black Card" program--but also pointed out that PFIP's prices are publicly available.  Berks also admitted that he used the same supplier as PFIP for certain equipment for the You Fit facilities, including a "step-up" device used as part of the "30-

---

[10]Rondeau explained that, while the plaintiffs and their franchisees were achieving success by catering to the casual gym user, their competitors who remained focused on serious weightlifters--as Berks had been prior to his involvement with the plaintiffs, according to Rondeau--were failing by comparison.

Minute Workout" routine, and that he did not know of any clubs besides his You Fit ones and PFIP's that used a traffic light to time that routine.  But Berks also testified that the "30-Minute Workout" is "in one form or another pretty big in the health club industry," and Rondeau acknowledged that the identity of the plaintiffs' supplier was not confidential.

In July 2008, PFIP commenced this action against Berks, You Fit, Inc., and You Fit One, Inc. (another Florida corporation, also owned by Berks and his daughter, that holds the lease for the St. Petersburg facility).  PFIP's amended complaint asserts nine numbered counts:

- trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(a) (Count 1);

- false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(a) (Count 2);

- copyright infringement in violation of the Copyright Act, 17 U.S.C. § 106 (Count 3);

- unfair or deceptive trade practices in violation RSA 358-A (Count 4);

- breach of the franchise agreement (Count 5);

- misappropriation of trade secrets in violation of RSA 350-B (Count 6);

- unjust enrichment (Count 7);

- breach of the settlement and license agreement (Count 8); and

- specific performance of the settlement and license agreement (Count 9).

III. **<u>Analysis</u>**

As mentioned at the outset, the defendants have moved to
compel arbitration of the plaintiffs' claim for misappropriation
of their trade secrets, invoking the franchise agreement's
arbitration clause, and to dismiss all other claims for lack of
personal jurisdiction or to transfer them to the Middle District
of Florida.  The defendants argue that Berks lacks the minimum
contacts with New Hampshire sufficient to subject him to personal
jurisdiction here on the plaintiffs' claims, and that the You-Fit
entities--whose gyms are marketed only to consumers in their
immediate vicinity in Florida, and have never transacted business
with anyone here--have no contacts with this forum at all.  As
for the forum selection clause in the franchise agreement, the
defendants say that, at most, the clause applies to claims
against Berks which arise out of the agreement itself and,
regardless, any such claims should be dismissed as subject to the
agreement's mandatory arbitration clause.

As also mentioned at the outset, the plaintiffs' response to
these arguments has changed over time.  They initially argued
that, contrary to the defendants' view, the forum selection
clause provided for jurisdiction over Berks on all their claims,
while the arbitration clause applied only to two of their

claims.[11]  In the alternative, they contended that Berks had

sufficient contacts with New Hampshire to subject him to

jurisdiction here regardless of the forum selection clause,

alleging that he had set up the "You Fit" gyms based on

"information he learned from [the plaintiffs] and materials [the

plaintiffs] provided Berks since 2006.  All of this material and

information was provided from New Hampshire."  The plaintiffs

also argued that the court should disregard the corporate form of

the You-Fit entities by imputing Berks's actions to them for

purposes of the jurisdictional analysis.

The plaintiffs did not, however, raise the series of

telephone calls between Berks and Rondeau in either their

principal objection or sur-reply or, for that matter, in their

---

[11]The plaintiffs also argued that Berks had waived his right
to arbitration because "at no time since Berks received notice of
the dispute has [he] demanded that the claims be submitted for
arbitration," citing a letter from Berks's counsel.  This letter,
however, unequivocally invoked the arbitration clause, demanding
that Pla-Fit comply with it by providing "sufficient notice of
the dispute to allow informal negotiation to take place"; as the
letter also pointed out, the clause mandates arbitration only in
the event the informal negotiation process fails.  The plaintiffs
further argued that, in response to the complaint, "Berks filed
his motion to dismiss for lack of personal jurisdiction rather
than a demand for arbitration," but the motion quite clearly asks
for dismissal of any claims under the franchise agreement
"pending arbitration."  As explained infra, Berks can no longer
invoke the arbitration clause because he is no longer a party to
the franchise agreement, so the plaintiffs' argument that Berks
waived his arbitration rights is moot, and since the defendants
have not challenged the good-faith basis for this argument the
court need not address the issue further.

supplemental briefing on whether the choice-of-forum clause from the franchise agreement continued to bind Berks despite the sale of his interest in the franchisee, Seven B-Fit, prior to any of the actionable conduct alleged in the amended complaint.  Again, that jurisdictional theory was not advanced until the hearing on the motion to dismiss, when the plaintiffs' counsel explained that, in preparing, he had located "another witness"--who turned out to be his clients' chief operating officer, Rondeau.

This court ordinarily does not consider theories raised for the first time at a motion hearing.  <u>See</u>, <u>e.g.</u>, <u>Doe v. Friendfinder, Inc.</u>, 540 F. Supp. 2d 288, 304 n.19 (D.N.H. 2008).  Because the defendants did not object on that basis, however, even when specifically given the opportunity to do so, the court will consider the theory here (insofar as it can given the minimal supporting briefing or authority from the plaintiffs, as discussed <u>infra</u>).  But first, the court will address what, until the hearing began, it had considered the crucial issue in deciding the defendants' motion to dismiss:  whether the forum selection clause continues to bind Berks.

**A.   The forum selection and arbitration clauses**

It is well-settled that "contractual forum-selection clauses . . . 'are prima facie valid and should be enforced unless

enforcement is shown by the resisting party to be "unreasonable"
under the circumstances.'" Silva v. Encyclopedia Britannica,
Inc., 239 F.3d 385, 386 (1st Cir. 2001) (quoting M/S Bremen v.
Zapata Off-Shore Co., 407 U.S. 1, 10 (1972)).  The question here,
however, is whether the choice-of-forum clause is still
"contractual" as to Berks, who was a party to the franchise
agreement only in his capacity as an owner of the franchisee,
Seven B-Fit, and sold that ownership interest some time before
the plaintiffs brought this suit against him.[12]  The court rules
that Pla-Fit cannot invoke the forum selection clause against

---

[12]A number of cases hold that a forum selection clause in a
contract can bind non-parties who nevertheless have some
connection to the contractual relationship, such as affiliate
companies who tendered the allegedly insufficient performance,
see Holland Am. Line Inc. v. Wärtsillä N. Am., Inc., 485 F.3d
450, 456 (9th Cir. 2007); Am. Patriot Ins. Agency, Inc. v. Mut.
Risk Mgmt., Ltd., 364 F.3d 884, 889 (7th Cir. 2004), or third
party-beneficiaries, Coastal Steel Corp. v. Tilghman Wheelabrator
Ltd., 709 F.2d 190, 201-03 (3d Cir. 1983), overruled on other
grounds by Lauro Lines v. Chasser, 490 U.S. 495 (1989).  But
these and like cases are not implicated here, where a contracting
party, Pla-Fit, has sued a defendant whose only relationship to
the contract, as an owner of the counterparty, terminated before
the litigation or, indeed, the alleged conduct giving rise to the
plaintiffs' claims.  If Pla-Fit were suing Berks for actions he
took on behalf of Seven B-Fit while he still owned the company,
in contrast, the choice-of-forum clause would very likely still
apply to him despite an intervening transfer of ownership.  See,
e.g., Manetti-Farrow, Inc. v. Gucci Am., Inc., 858 F.2d 509, 511
(9th Cir. 1988).  But that is not the nature of the plaintiffs'
claims and, in any event, they do not argue that Berks is bound
by the clause on any basis other than the language of the
franchise agreement itself.

Berks, and he cannot invoke the arbitration clause against Pla-Fit, by virtue of the sale of his interest in Seven B-Fit.

This ruling is dictated by the text and structure of the franchise agreement.  The parties to the agreement itself are Pla-Fit and Seven B-Fit, though certain provisions also bind Seven B-Fit's "Owners," i.e., anyone who "has a direct or indirect legal or beneficial ownership interest" in the corporation, or "Principal Owners," i.e., anyone who "has a ten percent or greater interest" in the corporation (parenthetical omitted).  There is no dispute that, at the time the franchise agreement was signed, Berks was both a "Principal Owner" and an "Owner" under the agreement.

One of the provisions that applies, by its terms, to "Owners" is the "Consent to Jurisdiction" clause, Article 19.14:

> Subject to [the arbitration clause], you and your Owners agree that we may institute any action against you or your Owners in any state or federal court of general jurisdiction in New Hampshire and you (and each Owner) irrevocably submit to the jurisdiction of such courts and waive any objection you (or he or she) may have to the either the jurisdiction of or venue in such courts.

The agreement defines "you" (and like second person pronouns) as Seven B-Fit, the franchisee.

There can be no question, then, that this provision applies to both Seven B-Fit and its "Owners."  The problem for the plaintiffs is that Berks no longer fits that description, because

he no longer "<u>has</u> a direct or indirect legal or beneficial ownership interest" in the corporation.  The plaintiffs' sole support for their view that the provision nevertheless continues to bind Berks is its inclusion of the word "irrevocably."  Because Berks <u>was</u> an "Owner" at the time he assented to the forum selection clause, the argument goes, he thereby submitted himself "irrevocably" to the jurisdiction of this court, i.e., without regard to whether he has since ceased to be an "Owner."

In the court's view, that is not the proper operation of the "Consent to Jurisdiction" clause, particularly in light of the other provisions of the franchise agreement spelling out the continuing obligations of an "Owner" after he transfers his interest in the franchisee.  As the plaintiffs point out, a court must interpret the disputed provisions of a contract by reading the agreement as a whole.  <u>See</u>, <u>e.g.</u>, <u>Glick v. Chocorua Forestlands Ltd. P'ship</u>, 157 N.H. 240, 248 (2008).[13]  The agreement as a whole makes clear that an outgoing owner of a franchisee retains only specified obligations to Pla-Fit, and that the forum selection clause is not among them.

As the plaintiffs acknowledge, a transfer of ownership in the franchisee is specifically provided for by Article 14,

---

[13]Because both sides have relied solely on New Hampshire law in making their contractual interpretation arguments, the court applies that law here, without deciding whether New Hampshire law applies to that or any other aspect of this case.

entitled "Transfer."  This section prohibits such a transfer without Pla-Fit's "prior written approval," which it promises to give subject to a number of conditions.  In relevant part, these conditions, specifically, Article 14.4.9, provide that the "transferring Owners have executed an agreement in favor of [Pla-Fit] agreeing to be bound, commencing on the effective date of the transfer, by the restrictions contained in Articles 17.2, 17.3, and 17.4 as if [the] agreement had terminated."  Those Articles, all effective upon termination or expiration of the agreement, require that the franchisee, in essence (1) cease using Pla-Fit's trademarks, (2) cease using its "Confidential Information," and (3) refrain from engaging in a "Competitive Business" within certain geographic areas.

As noted supra, there is no evidence that Berks ever signed, or was asked to sign, the "agreement to be bound" contemplated by Article 14.4.9.  Because the court has not been asked to decide the consequence of that fact, however, it has assumed, for the purpose of this motion only, that Berks is nevertheless bound as if he had executed such an agreement because the franchise agreement makes doing so a condition of Pla-Fit's approval of a transfer.  The provision still poses two problems to the plaintiffs' reading of the choice-of-forum clause.

First, the provision indicates that the franchise agreement treats a transfer of ownership as different from the termination

21

or expiration of the agreement.  This is noteworthy because the agreement also provides, "All of [Pla-Fit's] and your (and your owners' and affiliates') obligations which expressly or by their nature survive the expiration or the termination of this Agreement will continue in full force and effect notwithstanding its expiration or termination."  Had the agreement terminated or expired, then, Berks would still be bound by the "Consent to Jurisdiction" clause because it survives those events "by [its] nature," as a number of courts have held.  See, e.g., Allied Sound, Inc. v. Dukane Corp., 934 F. Supp. 272, 275 (M.D. Tenn. 1996); Advent Elecs., Inc. v. Samsung Semiconductor, Inc., 709 F. Supp. 843, 846 (N.D. Ill. 1989); Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc., 234 S.W.3d 679, 691 (Tex. App. 2007).[14]

Because the franchise agreement did not terminate, however, these cases--and the provision that, by default, the parties' obligations survive termination--do not apply here.[15]  Instead,

_____

[14]Likewise, a forum selection clause survives termination if it expressly provides that it does.  See, e.g., Weingard v. Telepathy, Inc., No. 05-2024, 2005 WL 2990645, at *3 (S.D.N.Y. Nov. 7, 2005).

[15]Some courts have held that "forum selection clauses are enforceable even when the relevant agreement has been terminated so long as the substance of the action is related to the original agreement."  Gessler v. Sobieski Destylarnia S.A., 2007 WL 1295671, at *4 (S.D.N.Y. May 3, 2007) (citing cases); see also, e.g., Tex. Source Group, Inc. v. CCH, Inc., 967 F. Supp. 234, 238 (S.D. Tex. 1997).  The plaintiffs do not rely on this line of

Berks's sale of his interest in Seven B-Fit triggered a separate provision of the agreement requiring Berks to assent (as this court assumes he did) to continue to honor particular obligations he had as an "Owner" notwithstanding the sale.  But, in the second problem for the plaintiffs' reading, these obligations do not include the forum selection clause.  See DVDPlay, Inc. v. DVD 123 LLC, 930 So. 2d 816, 819-20 (Fla. Dist. Ct. App. 2006) (ruling that termination of agreement did not lift its forum selection clause because the agreement listed the clause among the provisions that survived termination); Forum Corp. of N.A. v. Moore Corp. Ltd., No. 01-701, 2001 WL 755823, at *2 (Mass. Super. Ct. May 23, 2001) (same); cf. Oldlaw Corp. v. Allen, No. 07-1070, 2007 WL 2772697, at *4 (C.D. Ill. Sept. 24, 2007) (ruling that, where the termination clause provided that "neither Party shall have any further obligation to the other except for any obligation accruing prior to the date of termination," the forum selection clause applied to claims accruing pre-termination).

---

authority--or any authority--in support of their reading of the forum selection clause, but the court notes that those cases appear to rest on the assumption (stated or unstated) that the parties to the agreement intended the forum selection clause to survive termination.  See, e.g., Tex. Source Group, 967 F. Supp. at 237.  Here, as discussed at length, the agreement indicates that the parties did not intend the choice-of-forum clause to bind former "Owners."

Thus, under the interpretive principle that the inclusion of certain things implies the exclusion of other like things, see, e.g., Howe v. Howe, 87 N.H. 338 (1935), the inclusion of Articles 17.2, 17.3, and 17.4 among those provisions to which an outgoing Owner must agree to be bound implies that the forum selection clause is not similarly binding.  See Thome v. Layne Energy Sycamore, LLC, No. 05-2244, 2006 WL 1488895, at *2 (D. Colo. May 30, 2006) (ruling that the forum selection clause "was clearly terminated by" contractual language that "called for termination of the entire agreement (except as otherwise provided)" where the agreement did not otherwise provide).

Like Article 14.4.9, the "Investor Personal Covenants Regarding Confidentiality and Non-Competition" that Berks signed as an appendix to the franchise agreement further indicate that, when the parties intended to bind outgoing Owners to particular provisions of the agreement, they specifically provided for it. As the plaintiffs themselves point out, the franchisee and its Owners agree through these covenants that, in relevant part, "while you and they have a legal and beneficial ownership interest in Franchisee and thereafter" those parties will take a variety of measures to safeguard Pla-Fit's "Confidential Information" (emphasis added).  So, if the Owners' commitment to the forum selection clause were also meant to outlive their time as "Owners," one would expect that clause to contain language

24

expressly to that effect, just as one finds in this provision of
the "Investor Covenants" and Article 14.4.9 of the agreement.

Moreover, as the defendants noted at the hearing, the
covenants provide that PFIP may enforce them "in any court of
competent jurisdiction," rather than specifically in New
Hampshire. Since the covenants are the only part of the
franchise agreement that specifically sets forth the duties of a
former owner--again, Article 14.4.9 contemplates only that an
outgoing Owner will execute a further agreement containing
certain additional obligations, excluding consent to jurisdiction
here--the fact that the covenants authorize suit "in any court of
competent jurisdiction" further suggests that the choice-of-forum
clause in the agreement itself applies only to current Owners.

When the forum selection clause is read together with the
other provisions of the franchise agreement, then, the clause
simply cannot bear the significance the plaintiffs ascribe to it,
i.e., that it forever commits anyone who owned a piece of the
franchisee at the time the agreement was signed to being sued in
New Hampshire.[16]  Forum selection clauses, while enforceable

---

[16]The plaintiffs read the clause broadly not only as to whom
it applies, but what:  in their view, it "literally cover[s] 'any
action' that could arise, including any future . . . action that
could arise from the dealings between Berks and PFIP and Pla-
Fit."  The court's independent research revealed some support for
this view in the case law.  See, e.g. Stephens v. Entre Computer
Ctrs., Inc., 696 F. Supp. 636, 638 (N.D. Ga. 1988) (interpreting
"any action" to include claims that "arise either directly or

under New Hampshire law, "are subject to rigorous rules of interpretation."  Strafford Tech., Inc. v. Camcar, Div. of Textron, Inc., 147 N.H. 174, 176 (2001) (citing Bremen, 407 U.S. at 10).  The plaintiffs' interpretation of the choice-of-forum clause--which, despite the court's invitation, received very little attention in their supplemental brief--does not survive that level of scrutiny.  The forum selection clause in the franchise agreement between Pla-Fit and Seven B-Fit does not provide for jurisdiction over Berks, who sold his interest in Seven B-Fit more than six months before the plaintiffs commenced suit.  See Mobilificio San Giacomo S.p.A. v. Stoffi, No. 96-415, 1998 WL 125534, at *9 (D. Del. Jan. 29, 1998) (refusing to enforce forum selection provisions in agreements that had expired well before commencement of suit).

By the same reasoning, however, Berks may no longer take advantage of the agreement's arbitration clause.  "[W]hen an

---

indirectly from the business relationship evidenced by the contract") (internal quotation marks omitted); Oak Sys., Inc. v. Francotyp-Postalia. No. 01-2794, 2002 WL 442104, at *1-*2 (E.D. Pa. Feb. 5, 2002) (similar); but see Popeyes, Inc. v. Tokita, Nos. 87-3011, 90-1179, 1993 WL 386260, at *2 (E.D. La. Sept. 21, 1993) (interpreting "any action" to "apply to any action between the parties related to the franchise agreements" containing the forum selection clause).  Because the choice-of-forum clause here no longer applies to Berks, however, the court need not decide whether it applies to any or all of the plaintiffs' claims against him.

arbitration clause is invoked after the contractual relationship between the parties has ended, the parties' intent governs whether the clause's authority extends . . . ." Zandford v. Prudential-Bache Sec., Inc., 112 F.3d 723, 727 (4th Cir. 1997); see also, e.g., 1 Martin Domke et al., Domke on Commercial Arbitration § 12:6 (3d ed. 2004).  As is the case with the choice-of-forum clause, the text and structure of the franchise agreement make clear that the parties did not intend the arbitration clause to apply to former Owners.

> The clause, Article 19.12, states in relevant part that:

> the parties will attempt to resolve promptly by good faith negotiations any controversy or claim between the parties, including their respective affiliates, owners, officers, directors, employees, and agents, arising out of or relating to this Agreement . . . .  All controversies, disputes, or claims between the parties, including their respective affiliates, owners, officers, directors, employees, and agents, arising out of or relating to this Agreement that are not resolved by negotiations . . . shall on demand of either party be submitted for arbitration . . . .

Because Berks is no longer among the "owners, officers, directors, employees, and agents" of Seven B-Fit, this clause, like the choice-of-forum clause, no longer applies to him.  Just as Pla-Fit may no longer enforce that clause against Berks, then, he may no longer invoke the arbitration clause against Pla-Fit. See Intergen N.V. v. Grina, 344 F.3d 134, 143 (1st Cir. 2003) (observing that non-parties to a contract ordinarily may not invoke its arbitration clause); McCarthy v. Azure, 22 F.3d 351,

355 (1st Cir. 1994) (similar).[17]  His motion to dismiss is denied insofar as it relies on the arbitration clause.

## B.    Berks's contacts with New Hampshire

The court now turns to the plaintiffs' argument that, the choice-of-forum clause aside, Berks nevertheless has sufficient contacts with New Hampshire to subject him to jurisdiction here. "Personal jurisdiction implicates the power of a court over a defendant . . . both its source and its outer limits are defined exclusively by the Constitution." Foster-Miller, 46 F.3d at 143-44 (citing Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982)).  As this court observed in a previous dispute between some of the same parties, different constitutional amendments control personal jurisdiction, depending on the basis for federal subject-matter jurisdiction. PFIP, 2004 DNH 159, 5 (citing United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001)).  While, in a diversity case, the due process clause of the Fourteenth Amendment demands that the defendant have adequate contacts with the forum state for personal jurisdiction to lie, in a federal question case, the

---

[17]As these cases discuss at length, the court of appeals recognizes a number of theories allowing a non-party to invoke an arbitration clause--similar to those courts have used to bind non-parties to forum selection clauses, see note 10, supra--but the court need not consider any of those theories here because Berks has not raised them.

due process clause of the Fifth Amendment applies instead, and requires only that the defendant have adequate contacts with the United States as a whole.  <u>Swiss Am. Bank</u>, 274 F.3d at 618.

As this court also explained in <u>PFIP</u>, however, that distinction is largely academic in a case like this, where the plaintiffs' federal claims--like PFIP's claims in its prior lawsuit against Berks--arise under statutes that do not provide for nationwide service of process on defendants.  2004 DNH 159, 6.  So, to bring the defendants within the jurisdiction of this court, they must be served under Rule 4(k)(1) of the Federal Rules of Civil Procedure, which, in relevant part, authorizes service over a defendant "'only to the extent permitted by the law of the state in which the district court sits.'"  <u>Id.</u> (quoting <u>United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.</u>, 960 F.2d 1080, 1086 (1st Cir. 1992) (further internal quotation marks omitted)).

That law, the New Hampshire long-arm statutes reaching unregistered foreign corporations like the You Fit entities, N.H. Rev. Stat. Ann. § 293-A:15-10, and non-resident individuals like Berks, <u>id.</u> § 510:4, extends the jurisdiction of the New Hampshire courts as far as the due process clause of the Fourteenth Amendment allows.  <u>PFIP</u>, 2004 DNH 159, 6-7 (citing <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1388 (1st Cir. 1995)).  The question,

29

then, reduces to whether exercising personal jurisdiction over the defendants would comport with that constitutional provision.

Due process requires that a defendant have "sufficient minimum contacts with the state such that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)) (further internal quotation marks omitted). These contacts can give rise to general jurisdiction, based on the defendant's continuous and systematic activity in the forum state, or specific jurisdiction, based on the nexus between the plaintiff's claims and the defendant's forum-based activities. See, e.g., Hannon, 524 F.3d at 279. Here, the plaintiffs have not argued for general jurisdiction, so the court will consider specific jurisdiction only.

Specific jurisdiction consists of three elements: relatedness, purposeful availment, and reasonableness. See, e.g., Phillips v. Prairie Eye Ctr., 530 F.3d 22, 27 (1st Cir. 2008), cert. denied, 129 S. Ct. 999 (2009). To carry its burden to show personal jurisdiction, "[t]he plaintiff must demonstrate that each of these three requirements is satisfied." Id. Furthermore, and of no small consequence here, "[q]uestions of specific jurisdiction are always tied to the particular claims asserted," Phillips Exeter Acad. v. Howard Phillips Fund, 196

30

F.3d 284, 289 (1st Cir. 1999), and "jurisdiction is determined

separately as to each defendant," <u>Cambridge Literary Props., Ltd.</u>

<u>v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.</u>, 295 F.3d 59, 65

(1st Cir. 2002).  In other words, as this court has put it,

"[s]pecific personal jurisdiction is both defendant-specific and

claim-specific, so that jurisdiction may exist as to some claims

and some defendants but not others."  <u>PFIP</u>, 2004 DNH 159, 12.

     The plaintiffs have nevertheless based their jurisdictional

argument almost entirely on one claim against one defendant:

their claim for misappropriation of trade secrets against Berks.

Originally, the plaintiffs premised this argument on the notion

that, by receiving allegedly confidential information "provided

from New Hampshire," Berks had established contacts sufficient to

subject him to jurisdiction here.  One of the problems with this

theory is that, aside from the trip that two Seven B-Fit

employees made to New Hampshire to receive training,[18] the

exchange of information took the form of the <u>plaintiffs'</u>

---

[18]As referenced <u>supra</u> at note 6, the plaintiffs have offered
nothing to link this training to Berks's alleged misappropriation
beyond an unexplained assertion that the training included
"critical information."  Those kinds of bald statements carry no
weight in jurisdictional rulings, even under the prima facie
standard.  <u>See</u> <u>Mass. Sch. of Law</u>, 142 F.3d at 34.  Furthermore,
the employees were working for Seven B-Fit, not Berks personally,
so attributing their contacts with New Hampshire to Berks would
require piercing the <u>Seven B-Fit</u> corporate veil, which (as
opposed to piercing the veil of the You Fit entities, discussed
<u>infra</u>) has not been sought here.

communications into Florida, and "in the personal jurisdiction context, the focus is on the interests and activity of the defendant, not the plaintiff." Lorelei Corp. v. County of Guadalupe, 940 F.2d 717, 721 (1st Cir. 1991) (internal quotation marks and citation omitted).

So the plaintiffs' new theory relies on Berks's reaching into New Hampshire to communicate with Rondeau, allegedly extracting "trade secrets" to be misappropriated in the operations of the You Fit gyms.  Leaving aside the late hour at which it was first advanced, there are at least two weaknesses in this theory.  First, while the plaintiffs need not prove their claims by a preponderance of the evidence to make a prima facie showing of personal jurisdiction, they still must "proffer[] evidence that, if credited, is enough to support findings of all facts essential" to that conclusion.  Boit, 967 F.2d at 675.  It is doubtful whether Rondeau's account of his conversations with Berks, and attempts to explain the nature of the plaintiffs' claimed "trade secrets," rise to even that modest level, i.e., where the court could find that Rondeau in fact disclosed trade secrets to Berks during those conversations.  As discussed supra, Rondeau described the alleged "trade secrets" in only the vaguest terms, including counsel's "secret recipe" analogy, and those kinds of statements are generally insufficient to ground jurisdictional findings, see Mass. Sch. of Law, 142 F.3d at 34.

Second, the plaintiffs have provided no authority for their view that, when a defendant accesses the plaintiff's trade secrets through contacts with the forum state, but misappropriates the trade secrets through activity elsewhere, the misappropriation claim nevertheless meets the relatedness standard:  that the claim "'arise out of' or be 'related to' the activities within the forum state." Adelson, 510 F.3d at 49. And there is one case that squarely rejects the plaintiffs' theory of jurisdiction.  See Arch Aluminum & Glass Co. v. Haney, 964 So. 2d 228, 233 (Fla. Dist. Ct. App. 2007).

The plaintiff there, a Florida corporation, claimed that the defendant, its former sales manager, had misappropriated its trade secrets by disclosing them to a business that competed with the plaintiff out-of-state.  Id. at 231.  In ruling that it lacked personal jurisdiction, the court drew a distinction between the defendant's acquisition of the information--which, because it occurred while he was still working for the plaintiff, was lawful--and his alleged distribution of the information after he left the company--which was not.  Id. at 233.  Because only the acquisition had occurred in Florida, the court reasoned, the trade secrets claim did not arise out of the defendant's contacts with the forum state.  Id.

Likewise, while Berks allegedly accessed the plaintiffs' trade secrets through his contacts with them in New Hampshire, he

33

was authorized to do so by the confidentiality provisions of the
settlement and license agreement and the franchise agreement,[19]
and while he allegedly misappropriated those trade secrets, he
did so through conduct that occurred entirely in Florida.  Under
the reasoning of Arch Aluminum & Glass, then, the plaintiffs'
claim for misappropriation of trade secrets would not arise out
of Berks's contacts with New Hampshire.  Cf. Delta Education,
Inc. v. Langlois, 719 F. Supp. 42, 48 (D.N.H. 1989) (finding
jurisdiction over defendants who had misappropriated plaintiff's
trade secrets while working for the company in New Hampshire).

There is authority directly to the contrary, however, see
S & D Trading Acad., LLC v. AAFIS, Inc., 494 F. Supp. 2d 558, 567
(S.D. Tex. 2007) (ruling that, where defendant's employees had
been given authorized access to plaintiff's trade secrets while
visiting the forum, then left to misappropriate it elsewhere, the
trade secrets claim still arose out of the contacts with the
forum), as well as other cases that at least arguably support the
plaintiffs' position on an abstract level, see, e.g., Scuderi
Group, LLC v. LGD Tech., LLC, 575 F. Supp. 2d 312, 322 (D. Mass.
2008); Insituform Techs., Inc. v. Reynolds, Inc., 398 F. Supp. 2d
1058, 1066-67 (E.D. Mo. 2005); Unicru, Inc. v. Brenner, No. 04-
248, 2004 WL 785276, at *9 (D. Or. Apr. 13, 2004); Harry Miller

---

[19]Indeed, Rondeau testified that he would not have revealed
this information to Berks absent the non-disclosure provisions.

Co. v. Carr Chem Inc., 5 F. Supp. 2d 295, 298 (E.D. Pa. 1998).

Despite bearing the burden of showing personal jurisdiction,

however, the plaintiffs have furnished the court with no

authority on this point.[20]

The court considers Arch Aluminum & Glass persuasive here in

light of guidance from the court of appeals that the relatedness

standard "demands something like a proximate cause nexus" between

the defendant's contacts with the forum and the plaintiff's cause

of action.  Cambridge Literary Props., 295 F.3d at 65 (internal

quotation marks omitted).  It seems a stretch to say that Berks's

calls with Rondeau proximately caused an alleged misappropriation

of trade secrets which Berks had already been provided by virtue

---

[20]The cases the plaintiffs cited (for the first time) at the
hearing, as they acknowledged, did not attempt to decide where a
claim for misappropriation of trade secrets arises, but simply
stand for the uncontroversial proposition that, if a claim arises
out of a defendant's telephone calls into a forum state, then the
relatedness test is satisfied.  See Trade Wings, LLC v.
Technetics, Inc., 2002 DNH 182, 8-9 (finding breach of contract
claim arising out of allegedly defective goods to be related to
communications into New Hampshire during negotiation of contract,
as well as shipment of goods themselves into state); Pelchat v.
Sterilite Corp., 931 F. Supp. 939, 945 (D.N.H. 1996) (finding
claim for retaliation in violation of the FMLA to relate to
boss's calls to the plaintiff's home in New Hampshire harassing
her for missing work while caring for her premature infant); Lyme
Timber Co. v. DSF Investors LLC, 150 N.H. 557, 560 (2004)
(finding misrepresentation and similar claims to relate to
defendant's communications to plaintiff in New Hampshire which
included the alleged misrepresentations).  The question here,
though, is whether a claim for the misappropriation of trade
secrets through the plaintiff's use of them outside of the forum
relates to the defendant's contacts with the forum through which
the secrets were legally obtained.

of his status as the plaintiffs' licensee and the owner of their franchisee, i.e., without having to extract them from Rondeau. Indeed, that was how the plaintiffs themselves had set forth their misappropriation theory, at least before the hearing.

Nevertheless, the court will simply assume, without deciding, that the plaintiffs have made a minimal prima facie showing that their claim against Berks for misappropriation of trade secrets sufficiently relates to his telephone calls with Rondeau so as to satisfy the relatedness standard.  The court will likewise assume that Berks's alleged conduct satisfies the purposeful availment aspect of the jurisdictional test.  See Phillips Exeter Acad., 196 F.3d at 291 (noting "a natural blurring of the relatedness and purposeful availment inquiries in cases in which the alleged contacts are less tangible than physical presence") (parenthetical omitted).  The question remains whether exercising jurisdiction over the trade secrets claim against Berks would be reasonable.  The court concludes that the plaintiffs have not carried their burden to demonstrate that it would be, particularly in light of their failure to show jurisdiction over any other claim against any other defendant.

Before explaining that conclusion, the court will set forth its premise.  Neither in their briefing nor at the hearing did the plaintiffs offer more than the barest assertion that this court has jurisdiction over Berks (or any defendant) as to any

claim besides the one for misappropriation of trade secrets,
i.e., their claims for trademark infringement, false designation
of origin, unfair and deceptive acts or practices, and breach of
the franchise and settlement and license agreements arising out
of Berks's alleged infringement of the plaintiffs' marks through
the You Fit gyms, and their copyright infringement claim arising
from the mailing used to promote them.[21]  When asked about this
omission at the hearing, the plaintiffs simply analogized Berks's
series of telephone calls with Rondeau to a "river that flows
into the ocean" of their other claims.  That is manifestly
insufficient.

As this court observed in the parties' previous dispute,
personal jurisdiction over a trademark infringement or similar
claim generally exists only in the place where some conduct
essential to those claims occurred.  PFIP, 2004 DNH 159, 14
(citing Cambridge Literary Props., 295 F.3d at 64-65).  All of
the alleged conduct giving rise to the plaintiffs' trademark
infringement and related claims in this action occurred, or is

---

[21]As noted supra, the plaintiffs also assert an unjust
enrichment claim based on the defendants' allegedly "wrongful
activities."  So this claim, as well as the plaintiffs' claim
under RSA 358-A, could, as pled in the amended complaint,
incorporate the defendants' alleged misappropriation of trade
secrets, as well as their alleged use of the plaintiffs'
trademarks.  But the plaintiffs have not argued that and,
regardless, it would extend jurisdiction over only part of two
other claims based on Berks's telephone calls with Rondeau.

occurring, in Florida.  That state was the place of the

litigation between Berks and PFIP that produced the settlement

and license agreement, which authorized Berks to operate gyms,

also in Florida, using the plaintiffs' trademarks and other

intellectual property.  Both that agreement and the subsequent

franchise agreement were signed in Florida.  Most importantly,

though, Berks's alleged infringement of those trademarks and

anticipated copyright occurred wholly through the operations of

the You Fit gyms in Florida, which cater only to Floridians.

Just as in the parties' previous dispute, then, this court

lacks jurisdiction over the plaintiffs' claims, whether statutory

or contractual, which "focus on the defendants' <u>use</u> of [the

plaintiffs'] logos and trademarks, that is the dissemination of

the advertising and other display of the logos and trademarks in

Florida."[22]  <u>Id.</u> at 15-16.  That these allegedly infringing uses

_____

[22]As this court also ruled in <u>PFIP</u>, that the plaintiffs
claim to have suffered harm in New Hampshire from the defendants'
allegedly infringing activities in Florida is not enough on its
own to confer jurisdiction here.  2004 DNH 159, 13-14 (citing,
among other sources, 5 J. Thomas McCarthy, <u>McCarthy on Trademarks
and Unfair Competition</u> § 32:38 (4th ed. 2002)).  The intervening
decision by the court of appeals in <u>Northern Laminate Sales, Inc.
v. Davis</u>, 403 F.3d 14 (1st Cir. 2005), is not to the contrary.
There, while the defendant had made misrepresentations to the
plaintiff's president during a meeting in New York, those
statements were followed by a letter and an e-mail to the
plaintiff in New Hampshire repeating them and making additional
misrepresentations.  <u>Id.</u> at 19-20.  So there was more than simply
the in-state effects of the defendant's out-of-state conduct to
support personal jurisdiction.  <u>Id.</u> at 25.  <u>See</u> <u>NeoDevices, Inc.
v. Neomed, Inc.</u>, 2009 DNH 20, 9-11 (refusing to read <u>Northern</u>

of the plaintiffs' trademarks and copyrights have been combined with an unauthorized use of the plaintiffs' claimed trade secrets allegedly learned through contacts with New Hampshire--the "river into the ocean" theory--does not establish jurisdiction over all of those claims because, again, "[q]uestions of specific jurisdiction are always tied to the particular claims asserted." Phillips Exeter, 196 F.3d at 289.

Jurisdictional questions, as also already noted, must likewise be answered as to each defendant individually. See Cambridge Literary Props., 295 F.3d at 65. The plaintiffs have not identified any contacts at all between the You-Fit entities named as defendants here and the state of New Hampshire. Instead, the plaintiffs argue that Berks's contacts with New Hampshire should be imputed to the You-Fit entities, either under ordinary principles of agency or the equitable doctrine of piercing the corporate veil. Neither theory fits here.

It is well-settled that the actions of a corporation's agents are imputed to it for purposes of the jurisdictional inquiry (as for all other purposes, since a corporation can physically act only through its agents). See, e.g., Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 7-8 (1st Cir. 2002). It is equally well-settled, though, that a corporation is not

_____

Laminate to hold that in-state harm caused by out-of-state conduct suffices to confer personal jurisdiction).

responsible for the actions of those acting on its behalf--its promoters--before the corporation comes into existence.  See 1A William Meade Fletcher, Fletcher Cyclopedia of Corporations § 218, at 468 (rev. ed. 2002); 18 C.J.S. Corporations §§ 68-69, at 344-46 (1990).  The You-Fit entities were not incorporated until May 2007, around the time that the series of Berks's telephone calls into New Hampshire had come to an end.[23]  So those calls are not chargeable to the You-Fit entities for purposes of the jurisdictional analysis.  See Arch Aluminum & Glass, 964 So.2d at 234 (rejecting jurisdiction over a corporation based on its promoter's disclosure of confidential information in the forum prior to the corporation's existence). If, as the plaintiffs claim, Berks was acting on behalf of the You-Fit entities at all during those calls, he was doing so as a promoter, not an agent.

That brings the court to the plaintiffs' second theory of jurisdiction over the You-Fit entities:  that Berks incorporated them for the fraudulent purpose of misappropriating the

---

[23]By Rondeau's account, the calls began after Berks signed the franchise agreement in June 2006 and continued for approximately one year, so it is possible that the calls continued for a month or so after the You-Fit entities had come into existence.  But there has been no showing that whatever calls took place in that brief period would be sufficient to ground jurisdiction over those defendants; indeed, it is open to question whether the plaintiffs have even shown that the whole year's worth of calls gives rise to jurisdiction over Berks.

plaintiffs' trade secrets, so the entities' corporate form should be disregarded for purposes of the jurisdictional inquiry.  The court notes at the outset that, because the You-Fit entities were incorporated under Florida law, that law supplies the applicable standard for piercing their corporate veils, at least as to the state-law trade secrets claim (which, as just discussed, is the only claim to which Berks's New Hampshire contacts even arguably relate).  See Goya Foods, Inc. v. Unanue, 233 F.3d 38, 43 n.4 (1st Cir. 2000); 1 Fletcher, supra, § 41.90, at 696-97 (rev. ed. 2004).  The plaintiffs have not acknowledged that standard, or cited any Florida authority.[24]  The standard, however, is a demanding one:  a plaintiff must show that (1) the shareholder dominated and controlled the corporation to such an extent that it in fact lacked an independent existence and the shareholder was its alter ego, (2) the corporate form was used fraudulently or for an improper purpose, and (3) the fraudulent or improper use of the corporate form caused injury to the plaintiff.  See, e.g., Gasparini v. Pordomingo, 972 So. 2d 1053 (Fla. Dist. Ct. App. 2008).  The plaintiffs have come nowhere close to carrying

---

[24]Instead, the plaintiffs rely on Nisselson v. Lernout, 469 F.3d 143 (1st Cir. 2006), cert. denied, 127 S. Ct. 2131 (2007), and like cases, for the proposition that an agent's wrongful actions are imputed to the principal.  Those cases are inapposite because, as just discussed, the You Fit entities--and hence any principal-agent relationship between them and Berks--did not yet exist during the phone calls to New Hampshire that provide the sole support for the plaintiffs' claim to jurisdiction.

this "very heavy burden."  Gov't of Aruba v. Sanchez, 216 F.

Supp. 2d 1320, 1362 (S.D. Fla. 2002) (applying Florida law).

The plaintiffs rely heavily on the fact that Berks

"maintains control over You Fit and directs its operations," but

that is both unsurprising (given his status as the president and

majority shareholder of the You-Fit entities) and woefully

inadequate to disregard their corporate form.  "Even if a

corporation is merely an alter ego of its dominant shareholder or

shareholders, the corporate veil cannot be pierced so long as the

corporation's separate identity was lawfully maintained," id.

(bracketing and quotation marks omitted), which, by all

indications, is what happened here.[25]  The plaintiffs also

heavily relied (at the hearing, at least) on the fact that Berks

incorporated the You-Fit entities just eleven months after

another corporation he partially owned, Seven B-Fit, had signed

on as the plaintiffs' franchisee, arguing that this chronology

supports the inference that the You-Fit corporations were formed

for the improper purpose of misappropriating the plaintiffs'

trade secrets and the like.  The court need not, and cannot,

accept such a "farfetched inference." Mass. Sch. of Law at

Andover, 142 F.3d at 34.  Berks had been in the business of

---

[25]The corporate records of the You Fit entities introduced
at the hearing support this view, despite Berks's inability to
produce their articles of incorporation.

42

running gyms, through a number of different corporations, long
before Seven-B Fit became the plaintiffs' franchisee, so his
formation of additional entities to operate additional gyms
during that period is hardly suspicious, particularly in light of
his passive involvement in Seven B-Fit.

More fundamentally, though, the plaintiffs' argument
presumes that what the You-Fit entities are doing is in fact
"improper," and it suffices to say that the court remains
unconvinced of that proposition at this point.  The plaintiffs'
real theory of veil-piercing seems to be that, if a corporation
is engaged in "fraudulent and tortious conduct," it is unfair to
allow its shareholders to escape liability, but that is in fact
exactly what the principle of limited liability dictates, unless
the corporation's very existence is tainted by fraud "or some
analogous betrayal of trust."  Lipsig v. Ramlawi, 760 So. 2d 170,
187 (Fla. Dist. Ct. App. 2000).  That has not been shown here.

The upshot is that, at best, the plaintiffs have made a weak
prima facie showing of jurisdiction over Berks, and neither of
the other defendants, and have done so as to only one of the nine
claims in the amended complaint.  It follows that the
reasonableness element of the jurisdictional test carries more
weight than it would on a stronger showing of relatedness and
purposeful availment.  See  Adelson, 510 F.3d at 52.

43

Reasonableness is a function of the following "Gestalt factors":

> (1) the defendant's burden of appearing, (2) the forum
> state's interest in adjudicating the dispute, (3) the
> plaintiff's interest in obtaining convenient and
> effective relief, (4) the judicial system's interest in
> obtaining the most effective resolution of the
> controversy, and (5) the common interests of all
> sovereigns in promoting substantive social policies.

Id. (quoting United Elec. Workers, 960 F.2d at 1092).  In the

prior jurisdictional dispute between some of the parties here,

this court ruled that the factors counseled against exercising

jurisdiction, PFIP, 2004 DNH 159, 23, and much of that analysis

is applicable here as well.

First, Berks has not articulated any particular burden of

appearing in New Hampshire to defend the plaintiffs' claims, so

the first gestalt factor has no real significance here.  Id. at

21 (citing Sawtelle, 70 F.3d at 1395).  The other factors,

however, all weigh against jurisdiction.

Though New Hampshire has some interest in having the dispute

adjudicated here because the plaintiffs are New Hampshire

citizens, Florida's interest in serving as the forum state is

considerably stronger, as the site of all of the allegedly

wrongful activity.  Id. (citing Sawtelle, 70 F.3d at 1395).

Indeed, if the plaintiffs are to be believed, the defendants are

engaged in a wrongful appropriation of the plaintiffs'

intellectual property to divert Florida gym-goers to the

defendants' facilities at the plaintiffs' expense; Florida has a

strong interest in discouraging its residents, and protecting its other residents, from that kind of chicanery.  See, e.g., CFTC v. Cromwell Fin. Servs., 2006 DNH 019, 14 (noting, in transferring an action claiming violations of commodities trading laws to Florida, that state's "strong local interest" as the place where the violations occurred).  As this court reasoned in PFIP, that interest also tips the fifth Gestalt factor, the states' common interest in promoting substantive social policies, against jurisdiction here.  2004 DNH 159, 22-23.

It is the third and fourth Gestalt factors, however, that seal the deal.  While the plaintiffs undoubtedly see this court as a "convenient" forum to litigate their claims against the defendants, it is not an "effective" one, given their failure to demonstrate, even minimally, personal jurisdiction on any claim against any defendant other than the trade secrets claim against Berks.  So, to obtain relief on their other claims against Berks, and all their claims against the You Fit entities, the plaintiffs will need to re-file them in some other forum that does have personal jurisdiction.  Exercising jurisdiction over just the one claim, while the others are litigated elsewhere, will not serve the interests of the judicial system in the effective resolution of controversies.  See id. at 22 (citing Pritzker v. Yari, 42 F.3d 53, 65 (1st Cir. 1994)).  The Gestalt factors, on balance,

indicate that subjecting Berks to jurisdiction on the trade secrets claim would be unreasonable.  See id.

Because the plaintiffs have failed to carry their burden to show one of the required elements of specific jurisdiction, reasonableness (assuming that they have shown the other two, relatedness and purposeful availment), the defendants' motion to dismiss must be granted on that basis.  See Phillips, 530 F.3d at 27; PFIP, 2004 DNH 159, 23.  As the length of this order suggests, the defendants' motion, and the plaintiffs' arguments in response, presented a number of complex issues treated, in most instances, only obliquely by the caselaw.  By and large, the plaintiffs--who bear the burden to show jurisdiction in this, their chosen forum--failed to provide the court with any of that authority or even to develop their arguments sufficiently, forcing the court to take up the slack.[26]  This task was made all the more time consuming by the plaintiffs' last-minute shift in their theory of jurisdiction.  The plaintiffs, who frequently resort to this in this court in the name of protecting their trademarks and copyrights, see, e.g., PFIP, LLC v. Planet Health

---

[26]There are circumstances, e.g., cases involving pro se litigants or other parties of significantly limited financial resources, where this court arguably should, and often does, rely heavily on its independent research and analysis in examining the parties' positions.  But those circumstances are not present here, where the plaintiffs, who operate a successful business, are represented by skilled and experienced counsel from a highly reputable law firm.

& Fitness, Inc., No. 08-461 (D.N.H. Nov. 6, 2008); PFIP, LLC v.
Fitworld, LLC, No. 08-170 (D.N.H. Apr. 30, 2008); PFIP, LLC v.
Body Transit, Inc., No. 07-365 (D.N.H. Nov. 5, 2007), should know
better then to expect such indulgence.

The court is particularly distressed by the letter it
received from counsel for the plaintiffs shortly after the
hearing, notifying the court of a letter from counsel for the
defendants "demand[ing] to be included in the 'spam,'" i.e.,
"email marketing contacts regarding the various [PFIP] marketing
programs sent from New Hampshire to Mr. Berks's companies in
Florida."  Because the defendants had argued, in resisting
personal jurisdiction, that they had no interest in receiving
those unsolicited materials, the plaintiffs' counsel argued in
this submission, defense counsel's letter "demonstrates that
credibility does not favor Mr. Berks and his corporate
defendants"--which means, in turn, that "the YouFit companies
were formed with the intent to commit a fraud."

This letter is troubling for a number of reasons.  First,
while not submitted ex parte, it is nevertheless a communication
from a lawyer to a judge about a pending matter prohibited by
Local Rule 77.6.  Second, its conclusion, i.e., that Berks formed
the You Fit entities for a fraudulent purpose, bears virtually no
logical relationship to its premise, i.e., that Berks has
contradicted a position he took at the hearing.  Third, and quite

47

seriously, its premise is a clear misconstruction (and, one hopes, not an intentional misrepresentation) of the letter from the defendants' counsel, which on its face asked only that PFIP "include [PFE's] 'Planet Fitness' clubs on its website in the same manner and with same obligations and privileges" as franchised clubs, specifically "the privilege of running online promotions on their click-through webpages appearing on the Planet Fitness website," as allegedly required by the settlement and license agreement.[27]  The letter says nothing about the marketing communications.  The submission from the plaintiffs' counsel, then, supports a negative inference as to their credibility, rather than as to that of the defendants.  See also note 11, supra.

## IV.  Conclusion

For the foregoing reasons, the defendants' motion to dismiss[28] is GRANTED for lack of personal jurisdiction.  That motion's request to dismiss in favor of arbitration is DENIED, and its request to transfer is DENIED as moot.  The defendant's Motion for Protective Order Regarding Untimely Interrogatories

---

[27]This court expresses no view on whether that is in fact what the settlement and license agreement requires.

[28]Document no. 14.

48

and Document Requests (filed by all defendants)[29] is DENIED as

moot.  The clerk shall enter judgment accordingly and close the

case.


       **SO ORDERED.**

                                   _____

                                   Joseph N. Laplante
                                   United States District Judge

Dated:  April 27, 2009

cc:  Teresa C. Tucker, Esq.
     Allison C. Ayer, Esq.
     Christopher T. Vrountas, Esq.
     Andrew R. Schulman, Esq.
     Matthew S. Nelles, Esq.

---

[29]Document no. 35.